IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KATHY GARNER and | ) | |
| LOULEE W. KARN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  2:90cv688-MHT |
| | ) | (WO) |
| G. D. SEARLE | ) | |
| PHARMACEUTICALS & CO., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.  Introduction

On January 4, 2002, the court found in its liability opinion (doc. # 177) that the plaintiff Kathy Garner ("Garner") was sexually harassed and that because of her sex and in retaliation for filing an EEOC complaint, she was subjected to disparate treatment with regard to promotions, discipline, and discharge in violation of Title VII.  (Doc. No. 177, p. 2.)  The court also found that plaintiff Loulee W. Karn ("Karn") was sexually harassed and constructively discharged in violation of Title VII.  (*Id*.)  In addition, the court determined that both Garner and Karn were paid less than male employees for equal work in violation of the Equal Pay Act.[1]  (*Id*.)  The court ordered that judgment be entered in favor of Garner and Karn ("Karn") and against defendant G.D. Searle Pharmaceuticals & Co ("Searle").

---

[1]  The court also held that, "[s]ubject to the court's additional finding, based on after-acquired evidence, that Garner would have been discharged even in the absence of Searle's discrimination, . . . Garner and Karn are entitled to appropriate relief."  (Doc. No. 177, p. 2.)

(Doc. No. 179.)    In addition, the court determined that, in the event the parties could not reach an agreement on the issue of damages, the court itself would determine, after an additional hearing, how much the plaintiffs should receive in damages.  (Doc. No. 177, p. 128.)

Thereafter, the parties filed a joint notice of consent to exercise jurisdiction to determine remedies by the United States Magistrate Judge assigned to this case and motion for limited reference. (doc. # 230) The District Judge then referred all outstanding issues, other than liability, including the issues of the appropriate relief to be afforded the plaintiffs and costs and attorneys' fees, to the undersigned to conduct all proceedings and order the entry of final judgment in accordance with 28 U.S.C. § 636 and FED.R.CIV.P. 73.[2]  (Doc. No. 232, p. 1.)

On September 23, 2010, after completion of discovery and conclusion of an aborted attempt to appeal by Searle, this court conducted an evidentiary hearing to determine remedies.  (Doc. No. 291.)  The parties thereafter filed post-hearing briefs in support of their positions.  (Doc. Nos. 298, 299 & 302.)  Upon consideration of the evidence presented and the parties' briefs and argument, the court concludes that the plaintiffs are entitled to an award of both back pay and liquidated damages with respect to the Equal Pay Act claims, as well as an award for back pay and other appropriate relief, including interest, with respect

---

[2] The court specified in its order of reference that the Magistrate Judge does not have jurisdiction to hear or decide liability issues or to alter, amend, or otherwise change the District Court's findings, judgment, or memorandum opinion and order set forth in document nos. 177-179. (Doc. No. 232, pp. 1-2.)

to the Title VII claims.

## II. Discussion

To be blunt, the court approaches the question of appropriate damages in this case with some trepidation because at best this is an endeavor fraught with uncertainty. But any problems related to that uncertainty are Searle's to bear.

> We have recognized that "[t]rial courts and the parties themselves invariably lack perfect hindsight to forecast what would have happened had there been no unlawful acts." *Rodriguez v. Taylor*, 569 F.2d 1231, 1238 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *International Broth. of Teamsters v. United States*, 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977) ("process of recreating the past will necessarily involve a degree of approximation and imprecision"). We have concluded, however, that this "risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 889 (3d Cir.1984) (citing *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931)); *Mason v. Association for Independent Growth*, 817 F.Supp. 550, 555 (E.D.Pa.1993) (same).

*Starceski v. Westinghouse Elec. Corp.*,  54 F.3d 1089, 1100-1101 (3ᵈ Cir. 1995).

## A. Equal Pay Act

In its liability opinion the court found that Searle "showed reckless disregard for the matter of whether its conduct was prohibited by the Equal Pay Act" and concluded that "a three-year statute of limitations applies to the equal pay claims in this case."[3] (Doc. No. 177,

---

[3] A finding that a defendant acted willfully for statute of limitations purposes precludes a finding that the defendant acted in good faith for liquidated damages purposes. *See Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1573 n. 14 (11th Cir. 1988). *Cf. Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1164 (11th Cir. 2008)(determining that a jury's finding that defendants in FLSA case acted willfully for purposes of the limitations period precluded judge from finding that defendants acted in good faith for purposes of liquidated damages).

pp. 116-117.)  In addition, the court was

> convinced that Searle violated the provisions of the Equal Pay
> Act and paid Garner and Karn less than male sales
> representatives for equal work.  As affected employees under
> the Equal Pay Act, Garner and Karn are entitled to recover the
> additional amount (subject to the court's after-acquired evidence
> finding as to Garner) they should have received had they been
> paid equally.  In addition, because the court is also convinced
> that Searle did not act in good faith, they are also entitled to
> liquidated damages in an amount equal to their compensation for
> underpayment. . . .

(*Id.*, at 127-28.)

Although the court determined that the plaintiffs are entitled to liquidated damages, the plaintiffs argue that they should receive prejudgment interest without liquidated damages with respect to their Equal Pay Act claims.  Specifically, Garner asserts that she is entitled to $45,273.84 in back pay during her employment between June 27, 1987, to January 31, 1990, based on the pay differential compared to James Gruber, plus interest through September 23, 2010.  (Doc. No. 298, p. 1.)  Karn asserts that she is entitled to $47,632.05 in back pay during her employment between December 22, 1987, and June 15, 1989, based on the pay differential compared to Joe Gagliano, plus interest through September 23, 2010. (*Id.*, p. 2.)  It is no surprise that the defendants, however, argue that prejudgment interest is not permitted in Equal Pay Act cases.

The Equal Pay Act of 1963 amended § 206 of the Fair Labor Standards Act ("FLSA") to prevent pay discrimination based on sex, and the FLSA's statute of limitations and liquidated damages provisions apply to Equal Pay Act claims.  *Perez v. Sanford-Orlando*

*Kennel Club, Inc.*, 515 F.3d 1150, 1164 (11th Cir. 2008) (citing 29 U.S.C. §§ 206(d)(3), 216(b), 260).   When an employer has violated the Equal Pay Act, the employer "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  There is, however, a good faith defense, which permits the court to reduce or deny an award of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the Equal Pay Act.  *See* 29 U.S.C. § 260.  The employer bears the burden of establishing both the subjective and objective components of the good faith defense against liquidated damages.  *See Perez*, 515 F.3d at 1163.

In this case, the court has determined the plaintiffs are entitled to recover the additional amount they would have received had they been paid equally, as well as liquidated damages in an amount equal to their underpayment.  Because the court determined that Searle failed to establish good faith, the plaintiffs are entitled to liquidated damages under 29 U.S.C. § 216(b).  The plaintiffs, however, seek prejudgment interest without liquidated damages.

Most courts will not award both liquidated damages and prejudgment interest.  *See Brooklyn Bank v. O'Neil*, 324 U.S. 697, 715 (1945). In this Circuit, a plaintiff may not recover prejudgment interest in a private FLSA action.  *See Lindsey v. American Cast Iron*

*Pipe Co.*, 810 F.2d 1094, 1101 (11th Cir. 1987)[4]; *Townley v. Floyd & Beasley Transfer Co., Inc.,* No. 88-AR-0907-S, 1989 WL 205341, *3 (N.D. Ala. 1989) ("The law in this circuit is clear that a successful FLSA plaintiff is not entitled to an award of pre-judgment interest."). Thus, the court concludes that the plaintiffs are not entitled to an award of prejudgment interest under the Equal Pay Act. *See Perez*, *supra*. Consequently, this court must only determine the additional amount the plaintiffs would have received had they been paid equally.

The court has wide discretion in fashioning a remedy. *Jepsen v. Florida Bd of Regents*, 754 F.2d 924, 927 (11th Cir. 1985) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)). When determining whether the starting salaries of the plaintiffs were comparable to their comparators, the court in its liability opinion found that the "best way . . . is to compare the placement of Garner and Karn within the pay grade 3 salary range upon their dates of hire." (Doc. No. 177, p. 99-100.) With respect to the plaintiffs' and their comparators' starting salaries, the court specifically determined that

> Garner received a starting salary of $28,500. This placed her $500 below the midpoint of the 1987 salary range for pay grade 3. In contrast, Gruber and Swalley received starting salaries of $33,000. This placed them only $100 below the midpoint of the

---

[4] The court, citing *World Airlines v. Thurston*, 469 U.S. 111 (1985), noted that liquidated damages under the ADEA are different from those available under the FLSA. *See Lindsey v. American Cast Iron Pipe Co.*, 810 F.2d at 1102 ("ADEA liquidated damages awards punish and deter violators, while FLSA liquidated damages merely compensate for damages that would be difficult to calculate. Therefore, awarding both prejudgment interest and liquidated damages in an ADEA case does not constitute double compensation."). *See also Snapp v. Unlimited Concepts, Inc*., 208 F.3d 928, 938-39 (11th Cir. 2000) (noting that, under the FLSA, awards of damages are not punitive).

1990 salary range for pay grade 3.  Thus, when comparing their relative placements within the applicable salary ranges, Garner was paid $400 less than Gruber and Swalley.  Similarly, when Karn was hired in 1987, she received a starting salary of $32,000.  This placed her $100 above the 3/4 mark in the salary range for pay grade 3 for that year.  Therefore, when comparing their rank within the applicable salary range, Karn was paid $200 less than Gagliano

(Doc. No. 177, p. 100.)  Thus, Garner's starting salary was $400 less than Gruber's starting salary and Karn's starting salary was $200 less than Gagliano's starting salary.

The evidentiary materials indicate that both the plaintiffs and their comparators for purposes of the Equal Pay Act received merit raises.  On March 1, 1988, Garner's salary was increased to $30,000, which continued until the date of her discharge on January 31, 1990.  This placed her $300 below the midpoint of the 1988 salary range for pay grade 3.  (Trial Record, Defendant's Ex. 48.)  On December 1, 1990, Gruber's salary was increased to $34,700.  This placed him $1600 above the midpoint of the 1990 salary range for pay grade 3.  (*Id*.)  Thus,  when comparing their relative placements within the applicable salary ranges, Garner was paid $1700 less than Gruber.

In December 1988, Karn received a promotion, increasing her salary to $36,000.  This placed her $650 below the midpoint of the 1990 salary range for pay grade 4.  (*Id*.)  On September 1, 1990, Gagliano received a promotion, increasing his salary to $36,800.  This placed him $400 above the midpoint of the 1990 salary range.  (*Id*.)  Therefore, when comparing their relative placements within the applicable salary ranges, Karn was paid $1050 less than Gagliano.

7

Based on the foregoing, the court concludes that the plaintiffs are entitled to an award of damages in the amount they would have received had they been paid equally, as well as liquidated damages in an amount equal to their compensation for underpayment. Garner is entitled to an award of $2100, as this is the amount she would have received had she been paid equally, as well as an additional amount of $2100 in liquidated damages. Therefore, the court shall award Garner a total of $4200 in damages with respect to Garner's Equal Pay Act claim. Karn is entitled to an award of $1250, as this is the amount she would have received had she been paid equally, as well as an additional amount of $1250 in liquidated damages. Thus, the court shall award Karn a total of $2500 with respect to Karn's Equal Pay Act claim.

## B.  Title VII Liability

The court determined in its liability opinion that both Garner and Karn are entitled to back pay and other benefits they would have received absent the unlawful discrimination.[5] (Doc. No. 177, p. 126-27.)    Title VII requires that a plaintiff be made whole for discrimination suffered as the result of a defendant's actions. *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)).   Under Title VII, Congress characterized back pay as a form of equitable relief.  See 42 U.S.C. § 2000e-5(g)(1) (The court may "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems

---

[5] The court did not award Garner any backpay or frontpay after the date Searle discovered evidence indicating that she falsified a physician call report form.

appropriate."); *Teamsters v. Terry*, 494 U.S. 558, 572 (1990); *Miranda*, *supra* (citing *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763 (1976)). Thus, this court may award back pay and other appropriate equitable relief in this case.

### (1) An Award of Interest

Searle argues that the plaintiffs are not entitled to interest because the court rejected their demand for such relief. Specifically, Searle contends that the court's order that "Garner and Karn are entitled to back pay and other back benefits they would have received absent such discrimination"[6] is an implicit denial of the plaintiffs' demand for interest in this case. In addition, the defendant argues that the plaintiffs failed to challenge the court's rejection of their demand for interest by failing to file a motion for attorney's fees and expenses or address the denial of an award of interest in their November 18, 2005, motion to amend. The plaintiffs, however, argue that the terms "back pay" and "other appropriate relief" as stated in the court's opinion include interest by definition.

In its liability opinion, the court specifically found that, "[a]s victims of sex discrimination and retaliation, Garner and Karn are entitled to appropriate relief." (Doc. No. 177, p. 126.) The court also determined that, "subject to the court's after-acquired evidence finding with regard to Garner, Garner and Karn are entitled to back pay and other back benefits they would have received absent such discrimination." (*Id*., pp. 126-27.)

In *Loeffler v. Frank*, the United States Supreme Court discussed the effect of

---

[6] (Doc. No. 177, pp. 126-27.)

prejudgment interest in Title VII cases as follows:

> The back pay award authorized by § 706(g) of Title VII, as amended, 42 U.S.C. § 2000e-5(g), is a manifestation of Congress' intent to make "persons whole for injuries suffered through past discrimination." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362m 2373, 45 L.Ed.2d 280 (1975). Prejudgment interest, of course, is "an element of complete compensation." *West Virginia v. United States*, 497 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L. Ed. 2d 639 (1987). Thus, since Title VII authorizes interest awards as a normal incident of suits against private parties . . . . , it follows that respondent may be subjected to an interest award in this case.

486 U.S. 549, 557 (1988).

Consequently, prejudgment interest is not an added remedy. Rather, it is simply part of providing full compensation to the injured party. Prejudgment interest, as a legal matter, is intended to compensate injured parties both for the time value of the lost money as well as for the effects of inflation. *United States v. City of Warren, Mich.*, 138 F.3d 1083 (6th Cir. 1998). "Money today is not a full substitute for the same sum that should have been paid years ago." *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992). "Prejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed." *Transmatic, Inc. v. Gulton Industries, Inc.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999). "Prejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *City of Milwaukee v. Cement Division, National Gypsum, Co.*, 515 U.S. 189, 197 (1995).

An award of prejudgment interest is within the discretion of the court. *See Loeffler,*

*supra*.  After careful consideration, the court concludes that an award of prejudgment interest is appropriate in this case to adjust the back pay award for inflation and reflect the present day value of income that should have been paid to Garner and Karn in the past.[7]  *See Stone v. Geico Ins. Co.*, No. 8:05cv636-T-30TBM, 2009 WL 3720954, *2 (M.D. Fla. 2009).  In other words, prejudgment interest is simply a part of providing full compensation to the plaintiffs.  *See Saulpaugh v. Monroe Cmty Hosp.* 4 F.3d 134, 145 (2ᵈ Cir. 1993) (Title VII authorizes district court to grant prejudgment interest on back pay award; its purpose is to prevent employer from attempting to enjoy interest-free loan for as long as it can delay paying out back wages); *Robinson v. Instructional Sys., Inc.*, 80 F. Supp.  2d 203, 207 (S.D.N.Y. 2000) (employee was entitled to prejudgment interest on back pay award in Title VII retaliation action against employer; interest would help insure that employee was made whole, that employer would not profit from any delay in paying wages, and that remedial purposes of Title VII would be served); *Davis v. Rutgers Casualty Ins. Co.*, 964 F. Supp. 560, 575 (D.N.J. 1997) ("Prejudgment interest in a Title VII case is an equitable remedy meant to compensate for the plaintiff's loss of the value of money over time, and to avoid a windfall to defendant in paying lost wages in current dollars while having enjoyed the use

---

[7]The defendant argues that the reference to the undersigned Magistrate Judge "denied jurisdiction [to determine] . . . the equitable relief of interest."  Given the court's findings concerning the violations of law committed by the defendant with the concomitant necessity of providing appropriate complete relief, the defendant's attempt to cabin the court's ability to provide that relief is specious.  The defendant also argues that the plaintiffs' consent to the reference to the undersigned is an abandonment of any claim to interest.  This contention is equally specious.  The joint motion for the reference gave consent for the Magistrate Judge to determine among other things "the appropriate relief to be awarded the plaintiffs, and costs and attorney fees."  The order of reference says the same thing.  The argument of the defendant improperly conflates the issues of liability with the issue of damages.

11

of the capital over the years."); *Ford v. Rigidply Rafters, Inc*., 984 F. Supp. 386, 391 (D. Md.

1997) ("An award of [prejudgment] interest [on back pay] ensures that inflation does not

consume the value of a back pay award, and ensures that a discriminating employer does not

reap an unfair benefit from 'the inherent delays of litigation.'"); *Iannone v. Frederic R.*

*Harris, Inc.*, 941 F.Supp. 403, 413 (S.D.N.Y. 1996) (determining "it is generally an abuse

of discretion not to award interest, since that would reward the employer who has violated

Title VII by effectively providing it with an interest-free loan")). Thus, this court will

compute prejudgment interest pursuant to 28 U.S.C. § 1961 and consistent with the policy

and practice of the National Labor Relations Board (NLRB) at the applicable IRS prime rate.

*See*, *e.g.*, *Weaver v. Gallardo, Inc*., 922 F.2d 1515, 1528 (11th Cir. 1991); *McKelvy v. Metal*

*Container Corp*., 854 F.2d 448, 453 (11th Cir. 1988) (citing 28 U.S.C. § 1961); *EEOC v.*

*Guardian Pools, Inc.*, 828 F.2d 1507, 1512 (11th Cir. 1987) (determining that, consistent with

the policy and practice of the National Labor Relations Board, IRS prime rates are to be used

in calculating the amount of prejudgment interest on back pay awards in Title VII cases);

*Baldwin v. City of Prichard*, No. CA 07-0789-C, 2009 WL 1211385, * 6 (S.D. Ala. May 4,

2009).

This court notes that in a typical damages case interest accrues until the date of the

court's final judgment.  The plaintiffs, however, request that interest accrue until the date of

this court's evidentiary hearing on September 23, 2010.  Given the protracted nature of this

case, the court concludes that the plaintiffs' request to cease the accrual of interest to the date

of the evidentiary hearing in this case is an appropriate compromise.  Consequently, the court will discontinue the accrual of prejudgment interest on September 23, 2010.

### (2)   Promotion Liability[8]

Garner asserts that she is entitled to $14,399.69 as compensation for Searle's failure to promote her between September 1, 1988 to January 31, 1990, based on the pay differential compared to James Gruber, plus interest through September 23, 2010.  (Doc. No. 298, p. 1.) The defendant argues that Garner is not entitled to damages resulting from Searle's failure to promote her because she did not allege in her EEOC charge or her amended complaint that she was denied a promotion based on gender in violation of Title VII.[9]  (Doc. 299, p. 12-13.)

---

[8] Karn did not raise a failure-to-promote or disparate treatment claim in this case.

[9] In its pre-trial order, the court identifies the plaintiffs' claims as follows:

> . . . The plaintiffs contend that they were discriminated against by the defendant, G.D. Searle and its agent, Joe Flanders, because of their sex in discharge, constructive discharge, evaluations, job assignments, raises, compensation, training, discipline, supervision, assistance, work environment and promotions.  The plaintiffs also contend that they were retaliated against for opposition to defendants' unlawful behavior and/or participation in EEOC proceedings. . . .

> The plaintiffs contend that they were required to work in a sexually hostile environment which subjected them to severe emotional stress, harassment and abuse. . . .

> The plaintiffs were paid less than similarly situated males for performing substantially the same duties and responsibilities.  The defendant hires women sales representatives at lower salaries than men and at . . . lower job classifications.  The defendant further has a discriminatory policy and practice regarding evaluations and pay raises.  The defendant's policy of paying women less for their initial wages causes women to receive lower raises.  In addition, the defendant intentionally pays women less for promotions and merit increases than men.  The defendant has discriminated against women in promoting men to higher job classifications when similarly situated women are not promoted in a like fashion. . . .

13

In addition, Searle contends that the plaintiff failed to demonstrate a prima facie case of a failure-to-promote claim because the court did not enter a finding that a male employee received a promotion that she sought in September 1988. (*Id*., p. 13.)  Specifically, Searle argues that, "[f]rom a proof standpoint, the proper comparator would be the unidentified sales representative in Florence" because Garner testified in her 2009 deposition that this individual was the person who received the promotion she had sought.  (Doc. No. 299, pp. 13-14.)

As previously discussed, the undersigned does not have jurisdiction to hear or decide liability issues or to alter, amend, or otherwise change the court's liability findings in this case.  In its January 4, 2002, opinion, the court specifically found that Garner asserted a claim that "with regard to promotions, discipline, and discharge, Searle discriminated against her because of her sex and in retaliation for filing a complaint with the Equal Employment Opportunity Commission. . . ."  (Doc. No. 177, p. 1.)  The court  also found as follows:

> Promotions:   Garner   was   denied   a   promotion   in

---

> . . .
>
> . . .
>
> Garner was paid less than similarly situated men for performing work of equal skill, responsibility and effort.  Garner did not receive promotions when similarly situated men received promotions.  Furthermore, Garner's evaluations were lower than men whose performance was equal to or worse than hers.  Garner's initial job assignment and wages was lower than men who had equal or less qualifications as a sales representative.

(Doc. No. 124, pp. 2-3.)  The record does not indicate that the defendant objected to the court's identification of the plaintiffs' claims in it pre-trial order.  Consequently, the aforementioned claims, including the differential treatment and failure-to-promote claims, were presented and argued during the non-jury trial in March and April of 1993.

September 1988 from medical sales representative I, pay grade 3, to medical sales representative II, pay grade 4. While her sales numbers were low, at least two male sales representatives, who were in comparable positions, were granted promotions. Graham Crosby was promoted in September 1989 from a pay grade 3 to a pay grade 4 even though he was not meeting his sales budget. According to Searle, it was a "motivational promotion" and the personnel document granting the promotion points to a positive trend in his territory. However, the sales figures on which the promotion was based do not reflect that there was a significant increase between when Crosby took over his territory and when he received his first promotion. Most importantly, if the same criteria used to give Crosby a promotion were applied to Garner, she too should have received a promotion. The evidence at trial was that when Garner took over her territory, sales were very low, and she appeared to have turned the territory around to some extent by September 1988, when she was denied a promotion.

Crosby then received a second promotion in February 1991 to a pay grade 5. It was based on Crosby's 1990 performance appraisal in which he was rated "below sales" for the second consecutive year. Yet, despite this record he was promoted a second time. Frye admitted at trial that it was quite unusual to promote a representative who was not meeting budget for two years in a row. Even more importantly, Crosby's December 1990 sales figures, which appear in his 1990 performance appraisal, are quite similar to Garner's December 1989 sales figures. However, Garner was terminated on the basis of her December 1989 figures, while Cosby was promoted.

James Gruber received a promotion from pay grade 3 to pay grade 4 in November 1990, seven months after [he] was hired. Again, the basis for the promotion was that he had "reversed a long standing trend" in his territory and was "beginning to produce results." It was also stated that he had "the potential to meet budget." All of the same things, however, could have been said of Garner when she was denied her promotion.

15

That Garner's job performance did not warrant a
promotion is pretextual.

(Doc. No. 177, pp. 69-70.)  Thus, the court found that both Crosby and Gruber were proper

comparators with respect to Garner's disparate treatment claim, which includes a failure-to-

promote claim.

Although Garner's 2009 deposition indicates that an unidentified male employee

received a promotion, this does not establish that Garner has failed to prove her damages

with respect to her failure-to-promote or disparate treatment claim.  Searle relies on *Brown*

*v. Alabama Dep't of Transportation*, 597 F.3d 1160 (11th Cir. 2010), when arguing that

Garner is not entitled to damages because she failed to prove that a male employee received

a promotion that she sought in 1988.  In *Brown*, the court held that a plaintiff in a failure-to-

promote case must demonstrate that other employees of similar qualifications who were not

members of a protected group were promoted at the time the plaintiff's request for a

promotion was denied.  597 F.3d at 1179.  *Brown*, however, involved the promotion of

employees to new or open positions within the Alabama Department of Transportation.  The

liability findings of the court, however, indicate that promotions at Searle were not vacancy

driven but were a natural progression through pay grades and ranges based on performance.[10]

_____

[10] The Court determined:

Sales performance is also the most important factor in determining merit pay raises
and promotions.  Merit pay raises, which affect a sales representative's salary within a
particular grade, are based on a representative's annual evaluation and overall performance
rating, which . . . is tied primarily to a representative's sales performance.  Similarly,
promotional raises, which affect a sales representative's pay grade, are based principally on
sales performance.

Thus, it was unnecessary for the plaintiff to name the employee who received a promotion in 1988. *See Walker v. Mortham*, 158 F.3d 1177, 1186 & n. 15 (11th Cir. 1998) (discussing the test for a prima facie case as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and noting that "this original formulation allows a plaintiff to establish her prima facie case without even showing that another person was hired for the job, let alone anything about the successful applicant").

Garner asserts that Gruber is the proper comparator with respect to her disparate treatment claim.[11]  Garner compares the differences between her pay and Gruber's quarterly pay when calculating damages.  The defendant argues that, if Gruber is used as a comparator to determine relief, the salary increase Gruber received when he was promoted, rather than comparative total salaries, would be the proper number to use.  The court specifically found that Garner was subjected to disparate treatment, including the failure to promote.  Specifically, the Court determined that Garner was "subject to disparate treatment with regard to promotions, discipline, and discharge in violation of Title VII."  (Doc. No. 177, p. 2.)  Given the Court's determination that Gruber's promotion to Pay Grade 4 is the proper

---

Searle pays its medical sales representatives according to five pay grades.  The lowest pay grade for sales representatives is 3, and the highest pay grade is 7.  Within each pay grade there is a salary range.  Merit raises increase a representative's salary within a particular pay grade, which promotional raises move a representative from one pay grade to the next.  A different title accompanies each pay grade.

(Doc. No. 177, pp. 6-7.)

[11] In their pleadings concerning damages (Doc. Nos. 298, 299, & 302), neither the plaintiffs nor the defendant consider Crosby as a comparator.  Therefore, for purposes of this opinion, this court will compare Garner's and Gruber's salaries when calculating back pay.

benchmark for Garner's disparate treatment claim, this court will calculate the amount of back pay by determining the difference in earnings between Garner and Gruber on a quarterly basis. *See Kendrick v. Jefferson County Bd. of Educ.*, 13 F.3d 1510, 1513 (11th Cir. 1994) (holding that, in general, Title VII damages are calculated on a quarterly basis).

Accordingly, the court finds the difference in earnings between Garner and Gruber on a quarterly basis as follows:

|  | Gruber | Garner | Total |
|---|---|---|---|
| 09/01/88 to 09/30/88 | $2747.90 | $2373.14 | $374.76 |
| 10/01/88 to 12/31/88 | $8250.06 | $7124.91 | $1125.15 |
| 01/01/89 to 03/31/89 | $8250.06 | $8250.06 | -0- |
| 04/01/89 to 06/30/89 | $8250.06 | $8250.06 | -0- |
| 07/01/89 to 09/30/89 | $8250.06 | $8250.06 | -0- |
| 10/01/89 to 12/31/89 | $8250.06 | $8250.06 | -0- |
| 01/01/90 to 03/31/90 | $2747.90 | $1239.90 | $1508.00 |

Consequently, when calculating actual earnings, Garner is entitled to a total of $3007.91 in back pay, as well as prejudgment interest, with respect to her Title VII failure-to-promote claim.

### (3)   Discharge Liability

Garner asserts that, after subtracting interim earnings and other mitigation, she is

18

entitled to $305,871.39 of back pay. Garner bases her calculation on the difference in pay between herself and Gruber through the date of her discharge on January 31, 1990, until the date of trial on March 22, 1993, as well as interest through the date of the September 23, 2010 evidentiary hearing before this court.[12]   Karn also asserts that, after subtracting interim earnings and other mitigation, she is entitled to $816,887.00 of back pay. Karn's calculation is based on the difference in pay between herself and Joe Gagliano through the date of her constructive discharge on June 15, 1989 until her decision to stop seeking employment in pharmaceutical sales on December 31, 1998, as well as interest through the date of the September 23, 2010 evidentiary hearing.

In *Kendrick v. Jefferson County Bd. of Educ.*, 13 F.3d 1510 (11th Cir. 1994), the Court discussed the appropriate damages formula to apply in wrongful termination cases.

> The situation presented arises in a wrongful termination or refusal to hire case when the prevailing plaintiff had, during some but not all of the relevant damages period, income from a new job that exceeded that which she would have earned at the terminated or denied job.   The question is how the new employment income is to be offset against lost wages from the old job.   The Supreme Court addressed this question forty years ago in *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 73 S.Ct. 287, 97 L. Ed. 377 (1953).   The *Seven-Up* Court reversed the court of appeals, which had adopted an aggregate pay approach, and instead upheld the National Labor Relations Board rule that offsetting should be done on a quarterly basis.   The Court approved the following formula:
>
> Loss of pay shall be determined by deducting

---

[12] The District Court ordered that Garner should not be awarded any back pay or front pay after the date Searle discovered her misrepresentation on a physician call report.  (Doc. No. 177, p. 76.)

from a sum equal to that which [the employee]
would normally have earned for each such quarter
or portion thereof, [her] net earnings, if any, in
other employment during that period.  Earnings in
one particular quarter shall have no effect upon
the back-pay liability for any other quarter.

*Id*. at 345, 73 S.Ct. at 288 (citation omitted). . . .

Thirty years after *Seven-Up*, this Court adopted for Title
VII cases the quarterly earnings formula from the NLRA case
law.  *In Darnell v. City of Jasper*, 730 F.2d 653 (11th Cir. 1984),
. . . [the Court] explained:

Although we have discovered no cases applying
the "quarterly earnings formula" in the context of
a Title VII action, we conclude that such a
formula more faithfully serves the remedial
objectives of Title VII and, in any case, promotes
the consistent application of back pay awards
rendered under both Title VII and the NLRA.

*Id*. at 657.

*Kendrick*, 13 F.3d at 1513.

*(a) Mitigation of Damages.*  A majority of the post-hearing briefs are

devoted to the issue of mitigation; consequently, so is a large part of this opinion.  Therefore,

before determining the sum that Garner or Karn would normally have earned for each pay

period, this court must determine whether the plaintiffs mitigated their damages.  Title VII

provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person

or persons discriminated against shall operate to reduce the back pay otherwise allowable."

42 U.S.C.A. § 2000e-5.  Therefore, once a plaintiff makes a showing that she is entitled to

20

damages resulting from the discriminatory acts of an employer, the burden shifts to the employer to prove that the claimant is not entitled to the full amount of back pay sought. *Brown v. Alabama Dept. Of* Transp., 597 F.3d 1160, 1183 (11th Cir. 2010); Nord *v. U.S. Steel*, 758 F.2d 1462, 1470 (11th Cir. 1985). The defendant's burden can be met by the production of evidence establishing the amount of interim earnings received by the claimant, or through evidence showing that the claimant failed to exercise diligence in searching for or retaining interim employment. *Nord*, 758 F.2d at 1470.

Searle contends that Garner is entitled to no more than three weeks of back pay because she accepted a comparable sales position at Delta Foremost, and she was largely satisfied with the position.[13] Searle also argues that Garner failed to mitigate her damages by using reasonable diligence to find substantially equivalent employment.

> . . . "Substantially equivalent employment" is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated. If the former employee cannot find substantially equivalent employment, he may "lower his sights" and accept noncomparable employment. Title VII, however "does not require that a person remain employed despite dissatisfaction."

*Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991).

Searle has the burden of showing that Garner did not make reasonable efforts to obtain

---

[13] Searle does not challenge Garner's mitigation efforts during the three week period before beginning her new job at Delta Foremost. (Doc. No. 299, p. 22.)

21

comparable work.  When discussing the duties of sales representatives at Searle, the District

Court found the following:

> The primary responsibility of all of Searle's sales representatives is to call on doctors, hospitals, retail pharmacies, and drug wholesalers in order to promote the prescription and use of Searle products within their territory.  Each sales representative is expected to be fully versed in Searle's products and capable of comparing and contrasting the pharmacologic characteristics of Searle's products with competing products in the market.  A sales representative's duties include arranging for physicians to attend special instructional seminars that promote Searle's products. . . .

(Doc. No. 177, pp. 3-4.)

The evidentiary materials indicate that Garner's duties at Delta Foremost included

selling industrial cleaning products to local car dealerships, manufacturing companies,

nursing homes, and hospitals.  (Def's Ex. 14, Garner's October 1990, Dep., p. 26.)  Searle

argues that Garner's isolated statement during her deposition that her position at Searle and

her job at Delta Foremost were "comparable" establishes that she is not entitled to back pay.

Specifically, Searle contends that "Garner's acceptance of comparable, satisfactory

employment for 161 of the 164 weeks spanning the discharge date and the end of [her] back

pay period disproves entitlement to make-whole relief for those 161 weeks."

Although both positions are "comparable" to the extent they involved the sale of a

product, the court finds that there are more differences than similarities between Garner's

pharmaceutical sales position at Searle and her industrial-product sales position at Delta

Foremost.  First, selling heavy industrial cleaning products to car dealerships is substantially

different from the sale of pharmaceutical products to physicians in a medical environment. Secondly, Garner's position at Delta Foremost included some manual labor, including carrying heavy commercial cleaning products from one dealership to another. Plainly, Garner's job as a sales representative at Delta Foremost did not hold the same status as her position as a pharmaceutical representative at Searle. More importantly, the compensation at Delta Foremost was substantially less than the salary Garner could have received at Searle during the same time period. Garner's acceptance of employment as a sales representative in an entirely different industry when no full-time pharmaceutical jobs were available is a significant factor demonstrating that Garner used reasonable efforts to mitigate her damages in this case. This court therefore concludes that Garner mitigated her damages by lowering her sights and accepting a sales position in the industrial cleaning product industry.

Moreover, Searle has failed to overcome its burden of demonstrating that Garner failed to exercise diligence is searching for or retaining interim employment. There is no evidence indicating that other comparable sales positions were available in the pharmaceutical industry at the time Garner sought employment. *See Weaver*, 922 F.2d at 1527. Furthermore, Garner testified that she sent her résumé to numerous businesses and sought other employment while working at Delta Foremost.[14] (Def's Ex. #7, p. 7; Def's Ex.

---

[14] The court recognizes the possibility that "[a]t best, Garner applied for only eight jobs in the five year period from 1991 through 1996, or slightly less than two job applications per year." (Doc. No. 299, Def's Brief, p. 25.) Nonetheless, because Garner accepted a sales job at Delta Foremost and the defendant has failed to point to evidence indicating that any comparable pharmaceutical sales positions were available in the area during the relevant time period, the court finds that the defendant failed to overcome its burden of proving that Garner did not make reasonable efforts to obtain employment or otherwise mitigate her damages.

#10, p. 84; Def's Ex. # 12, p. 20; Def's Ex. # 14, pp. 23-25.)  This court therefore concludes that Garner reasonably mitigated her damages during the period between her constructive discharge on June 15, 1989 until the date of trial on March 22, 1993.[15]

Next, the court must decide whether Karn mitigated her damages in this case.  Karn asserts that she is entitled to back pay between the date of her constructive discharge on June 15, 1989, and the date she decided to discontinue her efforts to find a pharmaceutical sales position on December 31, 1998.  Searle contends that Karn is not entitled to back pay because she failed to mitigate her damages.  Specifically, Searle argues that Karn's acceptance of a part-time sales position followed by her decision to stop working after having a child demonstrates that Karn is not entitled to back pay.  Karn, however, maintains that she obtained a new job within a week after her constructive discharge and that she remained employed during 221 of the 234 weeks of the relevant time period.  She also contends that, although she sought full-time employment, she was unable to secure an available full-time job during the economic recession.  In addition, Karn contends that Searle has failed to present any affirmative evidence demonstrating that other better-paying jobs were available and that she would have been hired for those jobs.

The record indicates that Karn applied for several positions, both part-time and full-

_____

[15] The District Court ordered that Garner may not recover any back or front pay occurring after the date Searle discovered Garner's misrepresentation.  (Doc. No. 177, pp. 76-77.)  This court, however, is unable to determine the specific date Searle discovered the misrepresentation. Because the discovery was made during the course of litigation and shortly before or during the time of trial, the court will assume for purposes of this opinion that the defendant discovered the misrepresentation on the day of trial on March 22, 1993.

time employment, during the relevant time period.   Within one week after her discharge, Karn sought full-time employment with Whitehall Pharmaceuticals.  (Def's Ex. 13, Karn's October 1990 Dep., p. 204.)  A full-time position, however, was unavailable.  Whitehall Pharmaceuticals offered Karn a part-time position, which she accepted.  In June 1989, Karn began working part-time at Whitehall Pharmaceuticals with a salary of $18,000.  (Pl's Ex. 138;  Def's Ex. 13, p. 204.)  During her employment with Whitehall, she received a car allowance, automobile insurance and a retirement plan.  (Def's Ex. 13, p. 207.)  Toward the end of August 1990, Whitehall Pharmaceuticals laid-off all of its part-time employees.  (Def's Ex. 13., p. 208.)  Thus, Karn worked at White-Hall Pharmaceuticals for a total of fifteen (15) months.  (Pl's Ex. 121, 138;  Def's Ex. 9, Karn's October 8, 2009 Dep., p. 31.)

Between August and November of 1990, Karn sent résumés to several pharmaceutical companies and other businesses seeking full-time employment.  (Attach. to Def's Ex. 8; Def's Ex. 13, p. 211.)  Although a full-time position was unavailable, Karn accepted a part-time position in retail at Warner Lambert, beginning work on November 5, 1990.  (Def's Ex. 13, p. 209.) Warner Lambert paid Karn $10 per hour and provided a car allowance, disability insurance, and retirement benefits.  (Def's Ex. 13, p. 210.)  Karn worked twenty (20) hours per week for four or five months.  (Def's Ex. 13, pp. 43, 48.)  She stopped working at Warner Lambert in January 1991.  (Def's Ex. 13, p. 50.)

Shortly thereafter, Karn applied for pharmaceutical sales positions at Dow B. Hickman Pharmaceuticals, TAP Pharmaceuticals, Pfizer Corporation, General Medical

Corporation, as well as other sales positions with Gerber Products, Innisbrook Wraps, General Food USA, and Validata Computer and Research Corporation. (Pl's Ex. 75; Def's Ex. 1, Post-Trial Doc. 124; Pl's Exhs. 13-19.) In February 1991, Karn began working full time as a marketing director for Central Alabama Nursing Services with a salary of $28,000. (Def's Exh. 9, p. 50; Def's Ex. 11, p. 23.) Although she did not receive fringe benefits, such as a car, health benefits, or a retirement benefits, the company reimbursed her for gas and mileage. (Def's Exh. 9, p. 47.) Karn left her position at Central Alabama Nursing Services for a better job at Boehringer Mannheim ("Boehringer"), a medical supply company, in July 1991. (Def's Ex. 9, p. 50, 53-54; Def's Ex. 11, p. 24-25.)

At Boehringer, Karn received "the whole package deal," including a car, gas, health insurance, and retirement benefits, as well as a starting salary of approximately $35,000. (Def's Ex. 9, p. 56; Def's Ex. 11, pp. 33-34.) In 1992, Karn received a bonus, earning a total of $52,330. (Def's Ex. 9, p. 59.) On or around June 1993, Boehringer moved its territory from Alabama to Florida. (Def's Ex. 9, pp. 59-60.) Because Karn did not wish to relocate to Florida, she stopped working at Boehringer in June 1993. (Def's Ex. 9, p. 61.) Due to the relocation, Boehringer provided Karn with a severance package through May 31, 1993.[16]

---

[16] In most cases, the period of time for which back pay is calculated begins on the date the plaintiff is discharged and ends on the day when she finds full-time equivalent employment elsewhere. *See, e.g.*, *Stallworth v. Shuler*, 777 F.2d 1431 (11th Cir. 1985) (affirming court's judgment that defendant who was not considered for position of school superintendent should be awarded back pay from a date 2 years prior to filing of his complaint with the EEOC to the date 7 years later when he accepted the post of principal of a school); *Edwards v. J. C. Penney Co.*, No. C-80-1024-A, 1981 WL 309, *6 (N.D. Ga. 1981). In this case, the court finds that it would be inequitable to stop the back pay award on the date Karn began work at Boehringer. Karn was laid off from Boehringer through no fault of her own for economic reasons, specifically the reorganization of Boehringer's territory. Accordingly, it is not appropriate to stop Searle's

(Attach. to Def's Ex. 1.)

In October 1993, Karn sent her résumé to Syncom Pharmaceuticals in response to an advertisement in the newspaper for an available flex-time position. (Pl's Ex. 60; Def's Ex. 9, Pl's Dep., pp. 71, 73.) She also sent her résumé to Kimberly Quality Care, a nursing company. (Attach to Def's Ex. 1; Def's Ex. 9, pp. 74-75.) Between October 1993 and December 1993, Karn worked full time as a nurse for a group of doctors. (Def's Ex. 9, p. 62.) She stopped working in December 1993 when her third child was born. (Def's Ex. 9, p. 68.) During her deposition, Karn stated that she chose not to work for six weeks to take care of her newborn baby, but that she "did not quit forever." (Def's Ex. 9, p. 68.)

In January 1994, Karn answered several want-ads from the Montgomery Advertiser newspaper by applying for positions as a project director at Family Services Center, a health care liaison for EDS, an account executive for Southeast Health Plan, a sales associate at Solvay Animal Health, an admissions officer at a local college, a beauty advisor at Gayfers, a sales representative at AMRE, and a pharmaceutical sales representative at Boehringer Ingelheim. (Pl's Ex. 76; Attach. to Def's Ex. 1, p. 125.) In February 1994, Karn applied for an advertised part-time sales position at Kimberly Clark Corporation. (Attach. to Def's Ex. 1, p. 126.)

---

back pay liability on the date Karn received a comparable job at Boehringer. *See EEOC v. Fotios*, 671 F.Supp. 454, 460 (W.D. Tex. 1987) (court held it would be inequitable to end plaintiff's back pay eligibility on the day she first obtained new job where plaintiff was laid off from the position through no fault of her own, but deducted interim earnings she made during the extended period from the back pay awarded).

During one month in 1994, Karn worked part-time in a temporary position for Dr. Porter, earning $966.00.  (Def's Ex. 9, Pl's Dep., p. 68;  Def's Ex. 9, Job Application List.) On or around March 1994, Karn applied for a sales position in the Memphis District at Boehringer Ingelheim, as well as a position as a contract negotiator for Health Star, Inc., and an association coordinator for T.R. McDougal & Associates in Montgomery, Alabama. (Pl's Ex. 69-70;  Def's Ex. 1, Post-Trial Doc. Nos. 118-19, 127.)  In April 1994, Karn applied for a flex-time position with Syncom Pharmaceuticals, Inc.  (Attach. to Def's Ex. 1.) On August 19, 1994, Karn re-applied for a flex-time position with Syncom Pharmaceuticals. (*Id*.)  On November 8, 1994, Karn applied for a community relations position at Care One.  (Pl's Ex. 138;  Attach. to Def's Ex. 1;  Def's Ex. 9, Job Application List.)

Around this time, Karn decided that it did not make economic sense to work in a part-time position and pay for three children to attend daycare.   (Def's Ex. 9, Pl's Dep., pp. 74, 77-78.)  Karn, however, asserts that she "would have taken a full-time job ... with benefits [and a] company car."  (*Id*., p. 78.)   The court has no reason to doubt Karn's intentions in this regard, especially in light of substantial evidence indicating that she continued to exercise diligence in searching for employment.

On March 15, 1995, and April 5, 1995, Karn re-applied for available sales positions at Syncom Pharmaceuticals.  (Attach. to Def's Ex. 1.)  In May 1995, Karn applied for a part-time position at Professional Detailing Incorporated, a marketing service.  (Pl's Ex. 138; Attach. to Def's Ex. 1;  Def's Ex. 9, Pl's Dep., p. 82;  Def's Ex. 9, Job Application List).  In

October 1995, Karn applied for pharmaceutical sales positions at Abana and Merck Pharmaceuticals.  (Pl's Ex. 66;  Def's Ex. 1, Post-Trial Doc. 115.)

In September 1995, Karn applied for a full-time sales position at EDS, a business product company, and a nursing position with Hill-Rom, a home care company.  (Pl's Ex. 62;  Def's Ex. 9, Pl's Dep., pp. 84-85.)   In November 1995, Karn began working as a part-time sales representative for Professional Detailing Incorporation hired Karn.  (Pl's Ex. 120;  Def's Ex. 9, Job Application List.)  Between November and December of 1995, Karn earned $2382.00.  (*Id*.)  Between January and July of 1996, Karn earned $12,890.00.  (*Id*.)  The corporation reorganized and Karn was placed on laid-off status on July 31, 1996.  (Attach. to Def's Ex. 1.)

In January 1997, Karn applied for sales positions at Innovex and Ortho-McNeil Pharmaceutical.  (Pl's Ex. 64;  Def's Ex. 1, Post-Trial Doc. 113.)  In August 1997, Karn applied for a pharmaceutical sales position with UBC Pharma in Birmingham, Alabama, as well as ASTRA, USA.  (Pl's Ex. 122, 124;  Def's Ex. 9, Job Application List.)  She also sent her résumé to Innovex, Ortho-McNeil Pharmaceutical, and Hoechst.  (Pl's Ex. 123-24;  Def's Ex. 9, Job Application List.)  On or around September 1997, Karn interviewed for a position at Hoechst Marion Roussel, Inc.  (Attach. to Def's Ex. 1.)  On October 31, 1997, Karn faxed her résumé to The American Red Cross, The Merchandising Team, Sales Consultants of Boston, and Don Hulling, RSM.  (Pl's Ex. 138, 148-151;  Def's Ex. 9, Job Application List.)

29

From the foregoing recitation, it is obvious that substantial evidence in the record demonstrates that Karn diligently sought to mitigate her damages in this case by searching for and retaining employment.  Searle's argument that Karn is not entitled to back pay because she sought part-time employment lacks merit.  The evidence demonstrates that the majority of the advertised pharmaceutical or other similar jobs available at the time were part-time positions and that Karn diligently sought both part-time and full-time positions during the relevant time period.  Although Searle argues that there are gaps in Karn's job search and employment history, the defendant has failed to point to any evidence indicating that interim employment was available during those times or that it otherwise met its burden of proving that Karn failed to exercise diligence in searching for or retaining interim employment.  *See Nord*, 758 F.2d at 1470.

Karn, however, does concede that she did not intend to work during the six weeks after the birth of her third child.  Because Karn would have been covered under the Family Medical Leave Act, 29 U.S.C.A. § 2601, *et seq.*, and would have been eligible to take leave without pay if she had remained at Searle, the court concludes that back pay during the six-week period between January 1, 1994, and February 12, 1994, shall be deducted from this court's back pay calculation.  This court therefore concludes that, with the exception of the aforementioned six-week pay-period, Karn is entitled to the full amount of back pay, less any interim earnings.

30

### (b)    Salary Comparisons

Because the court found that Garner was subject to disparate treatment with regard to promotions, discipline, and discharge in violation of Title VII, the court must now determine what Garner "would have earned had she not been the victim of discrimination, and must subtract from this figure the amount of actual interim earnings." *EEOC v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1378 (S.D. Fla. 1998).  Thus, the court will compare Garner's actual interim earnings with Gruber's salary at Searle when determining what she would normally have earned for each quarter between the date of her termination on January 31, 1990 and the date of trial on March 22, 1993, and shall subtract any interim earnings from this amount.

This court must also determine the salary Karn would have received at Searle had she not been constructively discharged in violation of Title VII.  Searle argues that Karn's proposed back pay chart is factually and legally incorrect.  Specifically, Searle contends that Karn is not permitted to use Gagliano's pay rate as a comparison because she did not bring a Title VII disparate pay claim against the defendant.  The record indicates that, although Karn raised a claim that the defendant violated the Equal Pay Act, she did not raise a Title VII disparate treatment pay claim in her complaint or amended complaint.  (Doc. Nos. 1 & 61.)  In addition, the Court did not conclude at any point in its liability opinion that Karn was subject to disparate treatment with regard to pay in violation of Title VII.  (Doc. No. 177.) But that doesn't matter.

31

In *Crabtree v. Baptist Hospital of Gadsden, Inc.*, 749 F.2d 1501 (11th Cir. 1985), the plaintiff asserted violations of both the Equal Pay Act and Title VII. The plaintiff's Title VII claim complained only of unlawful discharge and not of salary violations. The Court held:

> The sex discrimination provisions of Title VII must be read in harmony with the Equal Pay Act. *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 170 (5th Cir.) *cert. dismissed* 423 U.S. 865, 96 S.Ct. 125, 46 L. Ed. 2d 94 (1975). Basing a back pay award under Title VII on a salary found to violate the Equal Pay Act would ignore both Title VII's purpose of making victims whole for economic losses suffered through past discrimination and the requirement that Title VII and the Equal Pay Act be read in harmony.

*Crabtree*, 749 F.2d at 1503. Thus, Karn argues that the Title VII back pay award should be based on Gagliano's higher salary which the Court determined she should have been paid under the Equal Pay Act, and the court agrees. This court, therefore, will compare Karn's actual interim earnings with Gagliano's salary at Searle when determining what she would have normally earned for each quarter between the date of her discharge on June 15, 1989 to the date she chose to stop seeking employment in pharmaceutical sales on December 31, 1998, and shall subtract any interim earnings from this amount.

### (c)    Fringe Benefits

The defendants initially argued that the plaintiffs were not entitled to damages for fringe benefits because they failed to present sufficient proof regarding their value. During the evidentiary hearing, however, the parties stipulated that the total monthly value of fringe benefits at Searle is $755.00. (Transcript of September 23, 2010, evidentiary hearing, Doc.

No. 295 at 3-4)  Thus, the court will calculate an award of damages by applying the amounts as stipulated by the parties, less the amount of any actual interim benefits.

Because the object of the back pay provisions of Title VII is to make employees whole for losses suffered due to unlawful discrimination, fringe benefits should be included when calculating back pay.  *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1364 (11th Cir.1982); 29 U.S.C. § 2617(a)(1)(A)(i)(I).  In this case, there is no evidence that Garner received any fringe benefits during her employment at Delta Foremost.  Therefore, Garner is entitled to an award of the value of fringe benefits between February 1, 1990 and March 22, 1993.

Karn concedes that she received equivalent benefits during her employment at Boehringer.  (Doc. No. 302, p. 30, n. 7.)  The evidentiary materials indicate Karn was employed and/or received severance pay with benefits at Boehringer between July 1, 1991 and March 31, 1993.  Consequently, the equivalent value of fringe benefits during Karn's employment at Boehringer should be deducted when calculating the total amount of damages.  The court further concludes that Karn is entitled to receive the value of fringe benefits between June 15, 1989 through June 30, 1991, and between June 1, 1993 through December 31, 1998.

C.    Tax Consequences

The plaintiffs request that this court include a tax component as part of the damages award to compensate for their additional tax liability as a result of receiving twenty years of back pay and/or interest in one lump sum.  (Doc. No. 298, p. 25.)

33

Back pay awards are taxable under the Internal Revenue Code. *United States v. Burke*, 504 U.S. 229 (1992). For income tax purposes, the IRS treats all back pay as wages in the year paid. *See* IRS Publication 957, http://www.irs.gov/publications/p957/ar02.html. Certainly, other courts have approved an award to offset the negative tax consequences of a back pay award. *See Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 441-43 (3rd Cir. 2009); *Sears v. Atchison Topeka & Santa Fe Ry.*, 749 F.2d 1451, 1456 (10th Cir. 1984). Searle argues that there is no controlling law in this Circuit which would substantiate an upward adjustment of the plaintiffs' damages award due to tax consequences.[17] (Doc. No. 299, p. 32.) Searle is correct that no decision of the Eleventh Circuit authorizes a judgment to account for negative tax consequences that result from a lump sum award of back pay. But no case prohibits either.

The difficulty here is not whether the law permits this type of award; rather, the problem is the lack of an evidentiary foundation for the court to make the necessary calculation. The plaintiffs suggest that the court apply a percentage increase of varying amounts seemingly based on tax tables. But the plaintiffs offer no evidence to support the legitimacy of this approach. Notwithstanding what the court said earlier about uncertainty, rank speculation is not the same, an the court is not inclined to engage in a purely speculative task of determining and then offsetting the plaintiffs' future tax liability. *Cf. O'Neill v.*

---

[17]Searle also argues that awarding a tax adjustment would exceed the jurisdiction conferred upon this court because the court did not award this relief in its liability opinion. Given the court's conclusion, this argument will not be addressed.

*Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 448 (E.D. Pa. 2000) (finding award for back pay under ADEA appropriate where plaintiff supported her request with testimony from a financial consultant). *See EEOC v. Joe's Stone Crab*, 15 F. Supp. 2d 1364, 1380 (S.D. Fla. 1998) (determining plaintiff failed to provide sufficient competent foundation evidence to permit the court to make the calculations). *See also Hukkanen v. International Union of Operating Engineers, Hoisting & Portable Local No. 101*, 3 F.3d 281 (8th Cir. 1993) (plaintiff failed to present a convenient way for the court to calculate the amount at the time the court announced judgment). In the absence of an evidentiary basis supporting a methodology for crafting an appropriate award, the court declines to award money damages to offset whatever increased tax liability the plaintiffs will experience by receiving a lump sum award.

### C. Damages Calculations

The court bases its damage calculations with respect to Garner on the following:

1. Garner is entitled to an award of $2100 as well as an additional amount of $2100 in liquidated damages with respect to her Equal Pay Act claim.

2. With respect to her Title VII claims, Garner is not entitled to any back pay after the date Searle discovered evidence indicating that she falsified a physician call report form. For purposes of this opinion, the court presumes the discovery occurred on the date of trial, March 22, 1993.

3. Garner is entitled to an award of back pay, including the value of fringe benefits and pre-judgment interest with respect to her Title VII claims.

4. The amount of interim earnings and benefits shall be subtracted from the back pay calculation.

5. Damages ceased to accrue on March 22, 1993. However, prejudgment interest accrued until September 23, 2010.

| | 1988 | 1989 | 1990 01/01/90 to 03/31/90 | 1990 04/01/90 to 12/31/90 | 1991 | 1992 | 1993 01/01/93 to 03/22/93 |
|---|---|---|---|---|---|---|---|
| Promotion Liability | 1,499.91 | -0- | 1,508.00 | n/a | n/a | n/a | n/a |
| Comparator Salary | n/a | n/a | n/a | 24,891.73 | 35,749.84 | 37,412.44 | 8,844.24 |
| Fringe Benefits | n/a | n/a | 1,590.00 | 6,795.00 | 9,060.00 | 9,060.00 | 2,090.77 |
| (Interim Earnings) | n/a | n/a | (1,239.90) | (11,167.65) | (8,642.92) | (7,723.04) | (1,251.24) |
| **Title VII Damages** | 1,499.91 | -0- | 1,778.10 | 20,519.08 | 36,166.92 | 38,749.40 | 9,683.77 |

Using the NLRA methodology, Garner requests $432,090.85 in prejudgment interest.
The court has reviewed Garner's calculation of interest and concludes that this amount is
appropriate and should be awarded based on her back pay award of $108,397.18.

This court concludes that Garner is entitled to the following award:

|   | Title VII | $108,397.18 |
|---|---|---|
| + | Interest | $432,090.85 |
|   | Subtotal | $540,488.03 |
| + | EPA | $4200.00 |
|   | Total | $544,688.03. |

The court bases its damages calculations with respect to Karn on the following:

1.    Karn is entitled to an award of $1250 as well as an additional amount of $1250
      in liquidated damages with respect to her Equal Pay Act claim.
2.    Karn is entitled to an award of back pay, including the value of fringe benefits,
      and prejudgment interest with respect to her Title VII claims.
3.    The amount of interim earnings and benefits shall be subtracted from the back

36

pay calculation.

4.    Karn is not entitled to back pay between January 1, 1994 and February 12, 1994, the six-week period she chose not to work due to the birth of her child.

5.    Damages ceased to accrue on December 31, 1998.  However, prejudgment interest continued to accrue until September 23, 2010.

| | 1989 06/15/89 to 12/31/89 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|
| Comparator Salary | 18,046.24 | 35,750.16 | 36,799.88 | 38,637.04 | 40,568.84 | 42,597.36 | 44,727.28 | 52,525.99 | 63,500.32 | 63,500.32 |
| Fringe Benefits | 4,878.46 | 9,060.00 | 9,060.00 | 9,060.00 | 2,265.00 | 9,060.00 | 9,060.00 | 9,060.00 | 9,060.00 | 9,060.00 |
| (Interim Earnings) | (7,925.40) | (12,842) | (34,116.16) | (38,637.04) | (38,228.84) | (966.00) | (2,382.00) | (12,890.00) | - 0 - | - 0 - |
| (Interim Benefits) | - 0 - | - 0 - | (4,530.00) | (9,060.00) | (2,090.77) | - 0 - | - 0 - | - 0 - | - 0 - | - 0 - |
| (Leave without Pay) | n/a | n/a | n/a | n/a | n/a | (5,324.67) | n/a | n/a | n/a | n/a |
| **TITLE VII Damages** | 14,999.30 | 31,968.00 | 11,743.72 | - 0 - | 2,514.23 | 45,366.69 | 51,405.28 | 48,695.99 | 72,560.32 | 72,560.32 |

Karn requests $1,040,843.90 in prejudgment interest.  Because Karn is not entitled to back pay with respect to the six-week period in which she was eligible for leave without pay under the Family Medical Leave Act, the amount of her award of prejudgment interest shall be reduced.  According to Karn's assessment of the NLRB interest rates calculated through September 23, 2101, prejudgment interest on $5324.67 is $17,014.10.  This court therefore concludes that $1,023,829.80 in prejudgment interest is appropriate based on her Title VII back pay award of $351,813.85.

The court concludes that Karn is entitled to the following award:

        Title VII      $351,813.85

|   | Interest | $1,023,829.80 |
|---|----------|---------------|
|   | Subtotal | $1,375,643.60 |
| + | EPA | $2500.00 |
|   |  | $1,378,143.60 |

The court will enter a separate final judgment for Garner and Karn and against Searle for these damages.

Done this 14th day of February, 2013.

      /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE